In re:                                                      Case No.: 8:10-bk-18160-CED
                                                            Chapter: 11

Aluminum Service, Inc.,

_____Debtor._____/              ***Emergency Relief Requested***

**DEBTOR'S EMERGENCY MOTION FOR AN ORDER (I) AUTHORIZING THE
DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C.
§§ 105(a), 361, 362, 363, 364(c) AND 364(d),  AND (II) SCHEDULING A FINAL
<u>HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)</u>**

Aluminum Service, Inc. ("ASI", "Company", "Debtor" or "Borrower"), the debtor and

debtor in possession, hereby moves this Court (the "Motion") pursuant to sections 105 and 364

of title 11 of the United States Code, 11 U.S.C. §101 et. seq. as amended (the "Bankruptcy

Code"), and Rules 4001 (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") for the entry of interim and final orders:

(a)(i)  authorizing, pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rules

4001(b)(1) and 4001(c)(1) for the Debtors to obtain post-petition financing (the "DIP

Financing") pursuant to the terms and provisions of that certain Post-Petition Loan and Security

Agreement (as it may be amended, supplemented or otherwise modified from time to time) (the

"DIP Financing Agreement"), to be entered into by and among the Debtor and Michael Kass (the

"Lender").  The DIP Finance Agreement will be filed under separate notice, but a summary of

the material terms is contained herein;

(a)(ii)   granting for the benefit of the Lender, pursuant to section 364(d) of the

Bankruptcy Code, a security interest in the Debtor's real property located in Ft. Myers, FL;

(b)  pending the final hearing on this Motion (the "Final Hearing") and entry of a final order on this Motion (the "Final Order"), authorizing emergency, post-petition loans under the DIP Financing Agreement from and including the date of an interim order on the Motion (the "Interim Order"); and

(c)  in accordance with Bankruptcy Rules 4001(b) (2) and 4001(c) (2), scheduling the Final Hearing and approving notice with respect thereto.

In further support of this Motion, the Debtor respectfully states:

## BACKGROUND

A.  The Chapter 11 Filing

1.      On July 29, 2010, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Petition Date").

2.      The Debtor continues in possession of its property and continues to operate its business as debtor and debtor in possession pursuant to section 1107 and 1108 of the Bankruptcy Code.

3.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 157 and 1334. The subject matter for this Motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper in this district pursuant to 28 U.S.C. §1408. The statutory predicates for the relief sought herein are §105, 361, 362, 363, and 364 of the Bankruptcy Code.

B.  The Debtor

4.      ASI is a supplier of exterior building materials such as roofing, siding, and insulation.

5.      ASI owns facilities in Tampa (its headquarters) and Ft. Myers, Florida, and leases 10 locations throughout the country.

6. ASI has no subsidiaries.

C. The Debtor's Management Team

7. Michael D. Patierno, President. Mr. Patierno is the sole director and shareholder of the Debtor. Mr. Patierno has been with ASI since 1970 and has served as its President since 1978.

8. Jeff Wietholter, Vice President of Sales. Mr. Wietholter manages sales and operations for one of ASI's key divisions.

9. C.W. "Cookie" Brinkman, Vice President of Marketing. After serving as director of sales at Alcoa for more than 20 years, Mr. Brinkman joined ASI approximately 8 years ago.

10. Karim Kharroubi, Vice President of Finance. Mr. Kharroubi joined ASI in 1997 and has served as Vice President of Finance at ASI since 2005.

11. Ervin Rodriguez, Vice President of Human Resources. Mr. Rodriguez joined ASI in May 2000 and has served as Vice President of Human Resources since March 2006.

D. Events Leading to Chapter 11 Filing

12. Since approximately late 2007, the Florida building materials market began showing signs of weakness, and for nearly three years the market continues to remain suppressed.

13. The Debtor enacted drastic cost-reduction efforts over this time to off-set double digit declines in revenue.

14. During this time, the Debtor and its primary lender have been unable to come to an agreement regarding the Debtor's continued access to its line of credit. Without access to working capital through the line of credit, the Debtor would not have the ability to continue as a going concern.

15.     The Debtor has been carefully examining its alternatives for the past several months and believes that as a result of substantial cost reduction efforts it is poised to succeed through a reorganization, bringing the greatest value to creditors as a going concern while saving a 44 year old company and nearly 100 jobs.

## RELIEF REQUESTED

16.     By this Motion, the Debtor seeks the authority to obtain the DIP Financing under the terms set forth in the DIP Financing Agreement and the Interim Order and all documents to be executed herewith.  The principal terms and conditions of the DIP Financing are summarized below:

a.  **Borrower**.  The Debtor.

b.  **Amount of DIP Financing**.  In accordance with the terms of the Interim Order, pending the Final Hearing, the Debtor may obtain advances under the DIP Financing Agreement only to the extent necessary to avoid immediate and irreparable harm to the Debtor, which funds shall be used to pay payroll and any other critical business expense that must be paid before the Final Hearing.  The Debtor anticipates that the amount that it will need to borrow approximately $1,350,000.00 prior to September 1, 2010 to cover payroll and critical business expenses.

c.  **Interest Rate, Fees and Expenses of Lender**.  Interest shall accrue on the outstanding principal balance of the DIP Financing at the rate of 12% compounded monthly.  The professional fees and costs incurred by the Lender in connection with the negotiation, documentation, Bankruptcy Court approval, administration and (if necessary) the collection of the amounts due

under the DIP Loan, shall be added to the amount of the loan to be paid when the loan matures.

d. **Term of the Loan and Amount Available**. The DIP Financing shall be repaid monthly on a 20 year amortized basis with the entire principal balance to be paid in full one year from the date of the first issuance of funds to the Debtor. The maximum principal amount that is available to the Debtor, at the discretion of the Lender, shall be $350,000.00, including Lender's attorney's fees, interest or the commitment fee.

e. **Priority and Liens**. The Debtor's post-petition obligations under the DIP Financing Agreement shall at all times pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected, second priority lien on the Debtor's real property located in Ft. Myers, FL, and such lien shall not attach to any avoidance actions.

## BASIS FOR APPROVAL OF THE DIP FINANCING

17.    The Debtor does not have sufficient available sources of working capital and financing to carry on the operation of their business and preserve the value of the Estate pending confirmation. In the absence of the DIP Financing, the operation of the Debtor's business would stop immediately and serious and irreparable harm to the Debtor and the Estate would occur.

### A.    Approval Under Section 364 of the Bankruptcy Code

18.    The Debtor proposes to obtain financing under the DIP Financing by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and a hearing, that the Debtor is "unable to obtain unsecured credit allowable

under section 503(b) (1) of the [Bankruptcy Code]."  Section 346(c) financing is appropriate

when the trustee or debtor in possession is unable to obtain secured credit allowable as an

ordinary administrative expense claim.  In re Crouse Group, Inc., 71 B.R. 544, 549, *modified on*

*other grounds*, 75 B.R. 533 (Bankr. E.D. Pa. 1987) (secured credit under 364(c) (2) is

authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

19.      Courts have articulated a three-part test to determine whether a debtor is entitled

to section 364(c) financing: (a) the debtor is unable to obtain unsecured credit under section

364(b), i.e., by allowing a lender only an administrative claim; (b) the credit transaction is

necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair,

reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed

lender.

**B.    The Debtor Does Not Have An Alternative to the DIP Financing.**

20.      The evidence at the Interim Hearing will show that a working capital facility of

the type and magnitude needed in this case could not have been obtained on an unsecured basis.

As will be shown, potential sources of the Proposed DIP Financing for the Debtor, obtainable on

an expedited basis and on similar terms were practically non-existent.  In these circumstances,

"[t]he statute imposes no duty to seek credit from every possible lender before concluding that

such credit is unavailable."  Bray v. Shenandoah Fed. Sav. And Loan Assn., (In re Snowshoe

Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).

21.      A debtor need only demonstrate "by a good faith effort that credit was not

available without "the protection of section 364(c).  Id.  Where there are few lenders likely to be

able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct an exhaustive search for financing.   In re Sky

Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D.Ga. 1988), *aff'd sub nom* Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R.117, 120 n.4 (N.D. Ga. 1989). The Debtor will show that the proposed DIP Financing was not available from any other source under more favorable terms.

22.     It is in the best interest of the estate that the DIP Financing be granted. There will be a substantial net benefit to the estate, in that without the DIP Financing the Debtor will shut down immediately, the secured creditors will get less and the unsecured creditors will get nothing.

23.     In addition, failure to authorize borrowing as requested is likely to result in loss of employees and shutdown of operations, all of which will make a reorganization unlikely or impossible.

**C.     Application of the Business Judgment Standard**

24.     As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors; management concluded that the DIP Financing was on the only alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to B., R. borrow money. In re Simasko Prod. Co., 47 B.R. 444,449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court").

25.     The Debtors exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Financing. The terms of the DIP Financing, which are substantially identical to the Pre-Petition Loan, are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Financing and borrow funds from the Lender on the secured, administrative super priority basis described above,

pursuant to 364(c) and (d) of the Bankruptcy Code, and take the other actions contemplated by the DIP Financing Agreement and as requested herein.

26.    Without the liquidity provided by the DIP Financing, the Debtors will be unable to pay their suppliers, employees and other constituencies that are essential to the orderly operation of their business and the retention of the value of their assets through a closing on the proposed asset sale. The Debtors; management exercised their best business judgment in negotiation the DIP Financing that is presently before the Court.

### D.    The DIP Facility is Necessary to Effectively Preserve the Assets of the Debtors' Estate

27.    As with most other large businesses, the Debtors have significant cash needs. Accordingly, access to substantial credit is necessary to meet the substantial day-to-day costs associated with continuing their business. Access to sufficient cash is critical to the Debtors. In the absence of immediate access to cash and credit, the Debtors' suppliers will refuse to sell critical supplies and services to the Debtors, and the Debtors will be unable to operate their business or maximize recoveries on their assets.

28.    For these reasons, access to credit under the DIP Financing is critical to promote; (a) continuing operations of the business by the Debtors; (b) the maintenance of the value of the Debtors' assets; and (c) the Debtors' ability to effectively maximize the value of their assets. The Debtors cannot wait for the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of the Motion. The Debtors' need for access to the DIP Financing therefore is immediate.

### E.    The Terms of the DIP Facility are Fair, Reasonable and Appropriate

29.    The Debtors are unable to obtain unsecured credit allowable solely as an administrative expense. The proposed DIP Financing reflects the exercise of sound and prudent

business judgment. The Debtors would not have been able to obtain financing on an unsecured basis, or otherwise. In the Debtors' business judgment, the DIP financing is the best financing option available in the circumstances in these cases.

30.     The proposed terms of the DIP Financing are fair, reasonable and adequate in that these terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the DIP Financing is to enable the Debtors to maintain the value of their estates pending a sale of substantially all of their assets. Importantly, the terms of the DIP Financing are substantially identical to those of the Pre-Petition Loan. The Lender has agreed, in effect, to continue the Debtors' per-petition financing arrangement subject only to provisions necessary to implement the same in the Chapter 11 Context.

31.     The Debtors believe the Interim Order represents a fair and reasonable interim arrangement for DIP Financing pending a final hearing.  The Interim Order does not purport to make any findings with regard to the amount of the Pre-Petition indebtedness or the validity, extent or priority of the Lender's liens and security interests that bind any entity other than the Debtors.  Accordingly, the rights of all parties in respect of such matters are fully reserved. Moreover, the termination provisions of the Interim Order afford the Debtors a reasonable opportunity to seek relief from this Court.  Thus, unsecured creditors will not be prejudiced by entry of the Interim Order.

32.     The proposed DIP Financing provides that the security interests and administrative expense claims granted to the DIP Lender is subject to the Carve Out.  In Ames Dept. Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the bankruptcy court found that such "carve-

outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel. <u>Id</u>. at 40.

33.     The fairness and reasonableness of the terms of the DIP Financing will be shown at the Interim and Final Hearings.

**F.     <u>Request for modification of the Automatic Stay</u>**

34.      As set forth more fully in the proposed Interim Order, the DIP Financing Agreement contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Lender to: (a) file financing statements, or other similar documents to evidence the Lender's security interests under the DIP Financing; (b) give the Debtors any notice provided for in the DIP Financing Agreement; (c) subject to certain notice requirements, execute upon their security interests or exercise other remedies under the DIP Financing Agreement in the event of an Event of Default; and (d) take such other actions required or permitted by the DIP Financing Agreement.  Stay modification provisions of this sort are ordinary and usual features of post-petition, debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  The Court, Accordingly, should modify the automatic stay to the extent contemplated by the DIP Financing Agreement and the Interim Order.

**G.     <u>Request for Immediate Interim Relief</u>**

36.     Pending the Final Hearing, the Debtors require immediate use of financing for, among other things, maintenance of their operations and other working capital needs.  It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post petition operating expenses, as well as the pre-petition expenses approved in the first day

orders, to minimize the damage occasioned by cash flow restrictions and maximize the potential value of their assets.

37.     Absent immediate use financing, the Debtors will be unable to pay operating expenses and, therefore, unable to maintain the value of their business pending the Final Hearing.  Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors and other parties in interest.

38.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to obtain emergency interim credit under the DIP Financing, which shall not exceed the amounts required during such period for the operation of the Debtors' business in the ordinary course, in accordance with and pursuant to the terms and conditions contained in the DIP Financing Agreement and the Interim Order.

39.     Bankruptcy Rules 4001(b) and 4001(c) permit a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

40.     In conjunction herewith and on motion filed simultaneously herewith, the Debtor seeks DIP financing from another lender for the balance of the $1,350,000.00 in DIP financing requested herein.

### H.     Time Required for Hearing

41.     Pursuant to Local Rule 9004-2(f), the Debtors estimate that the interim hearing on this Motion will require 30 minutes for presentation and argument, and the final hearing on this

Motion will require 2 hours.

Respectfully submitted,

/s/ Christopher C. Todd
RICHARD J. McINTYRE
rich@mcintyrefirm.com
Florida Bar No. 0962708
CHRISTOPHER C. TODD
chris@mcintyrefirm.com
Florida Bar No. 72911
McIntyre, Panzarella, Thanasides
   & Eleff, P.L.
6943 East Fowler Avenue
Tampa, Florida 33617
813-899-6059; 813-899-6069 Fax
Attorneys for Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion has been furnished by U.S. Mail or by electronic CM/ECF Noticing System on all creditors and parties in interest on the attached matrix on the 30th day of July, 2010.

/s/ Christopher C. Todd